WILLIAM J. ALBERT
AND EMILY J. ALBERT, HIS WIFE,
vs.
THE SAVINGS BANK OF BALTI-
MORE ET AL.

July Term, 1849.

[BONA FIDE PURCHASER OF STOCK—TRUSTEE'S RIGHT TO TRANSFER—EXECUTED
CONTRACT OF A CORPORATION FORBIDDEN BY ITS CHARTER—LIABIL-
ITY OF A CORPORATION ON TRANSFERS OF ITS STOCKS.]

A BONA FIDE purchaser of stock in a bank or other corporation, standing in the name of trustees, without notice of the trust, will be protected, whether the trustees have the legal authority to make the transfer or not.

If there be no fraud or collusion, the bank and not the transferee must abide the loss, if a loss be sustained by any act of the proper officer of the bank in the transfer of its stock, arising either from a misconception of his duty or a want of judgment.

The mere addition of the word "*trustee*" to the name of the person who appears on the books of a corporation as the stockholder, with nothing to indicate the character of the trust, or the party beneficially interested, will not deprive him of the legal capacity to transfer the stock, though by so doing, he may commit a breach of trust.

A corporation may avail itself of its want of authority to make the contract sought to be enforced against it, though it has received and enjoyed the consideration upon which it was made.

But, where a contract of a corporation has been *executed* by the parties to it, it is not competent for a mere stranger to the contract to assail it, and deprive the corporation of the advantage derived from it, upon the ground, that it was interdicted by the charter.

Where the entry on the transfer book of a bank displayed the origin, nature and character of the trust, and who were the beneficiaries, it was HELD— that the bank had notice of the trusts with which the stock was clothed, and would be responsible, if it permitted a transfer to be made by other persons than the trustees, who alone were authorized to make it.

In such case, if the trustees themselves should offer to transfer, under circumstances calculated so excite suspicion that they were about to abuse their trust, the bank would be bound to institute the necessary inquiry ; and if it omitted to do so, and loss resulted, the loss would be thrown upon it.

Where a party transfers stock as "*executor*," the bank must know that there is a will of which, in Maryland, it is bound to take notice.

But, where the entry upon the books of a corporation only showed that the stock stood in the names of certain persons, as trustees, without showing who were the *cetuis que trusts*, or what the nature of the trust was, it was HELD—that this entry standing by itself, was not sufficient to put the corporation upon the inquiry, and to make it responsible, on the ground of negligence.

THE CHANCELLOR:

This case presents questions of importance and difficulty.

By the will of Talbot Jones, who died in the year 1834, there was bequeathed to the testator's two sons, Samuel Jones and Andrew D. Jones, and the survivor of them, a portion of his estate, in trust, for the use and benefit of his daughter, Emily Jane Jones, now Mrs. Albert, and one of the complainants, during her natural life; to the end that she, during that period, be permitted to have and enjoy the same, and the income and profits thereof, to her own use and benefit, and without being subject to the control, power, or disposal of any husband she might thereafter have, or in any manner liable for the payment of his debts; and for the income thereof, her receipts, whether sole or covert, are made sufficient discharges; and by the will, the parties named as trustees are made executors.

Afterwards, upon a bill filed by certain of the parties in interest, against the said executors and trustees, for the purpose of obtaining the direction and aid of the court, in the execution of the trust, and for other purposes, a decree passed on the 6th of November, 1841, by which it was, among other things, adjudged, that said Samuel and Andrew D. Jones, as trustees under said will, should hold in trust, to and for the use of Emily J. Albert, certain property therein mentioned; included in which are several sums of the six per cent. stock debt of the city of Baltimore, amounting together to $6,300.

It does not appear from the will of Talbot Jones, whether any portion of the stock debt of the city of Baltimore was included in the devise and bequest for the use of his daughter, the present Mrs. Albert, the property so devised, consisting of other stocks which are enumerated; portions of his real estate and the rest and residue thereof. But it does not appear that on the 20th of November, 1841, Samuel Jones and Andrew D. Jones, executors of Talbot Jones, transferred by endorsements on the certificates to themselves, as trustees, three parcels of said stock, amounting in the aggregate to the sum of $6,299 99; and that the dividends upon this stock from the 1st of January, 1842, to the 1st of October, 1845, inclusive, were paid to Wil-

liam G. Albert, the husband, upon an authority to Emily J. Albert, dated the 10th of December, 1841, and signed by Samuel and Andrew D. Jones, executors.

It further appears that on the 16th day of October, in the year 1845, this stock was transferred to the Savings Bank of Baltimore, by the endorsation of the said trustees and filing the original certificates in the office of the register of the city, to secure the repayment of the sum of $5,500, loaned by the bank to the commercial firm of Talbot Jones & Co., which consisted at that time of the said Samuel Jones only. The original certificates, copies of which are produced, and which amount to the sum mentioned, certify, "that the corporation of the city of Baltimore is indebted to Samuel Jones and Andrew D. Jones, trustees," the several sums of money therein expressed, and upon the back of each of them an authority to transfer to the Savings Bank of Baltimore is signed by these parties, as such trustees. Certificates were issued to the bank accordingly, dated on the day of the transfer by the trustees, signed by the proper officers of the city, stating that the city was indebted to the bank in the sums of money mentioned in the certificate, and thus stood in the name of the bank until the 19th of January, 1847, when a note given by Talbot Jones & Co., in renewal of the note first given for the money loaned, not having been paid, the stock was sold by the bank for its reimbursement, leaving in its hands a surplus of $656 90, which is held for the use of the person legally entitled thereto.

The bank denies all knowledge of the decree of the 6th of November, 1841, and of the trust for the female complainant; or that the stock in question stood upon the books of the city in the names of Samuel and Andrew D. Jones, as trustees; or that the same was transferred to it by said trustees. It denies that it knew at the time or knows now, by whom the transfer was made, being satisfied with, and not looking or supposing they were bound to look beyond what appeared upon the face of the certificates; and it may be stated without qualification or reserve, that there is nothing in the record to show that the

bank knew, or had reason to suspect, that the said stock was affected by a trust of any description whatsoever.

In truth, the counsel for the complainants was not understood to ask for a decree against the bank upon the ground of either actual or constructive notice of the trust; the right to relief, as against it, being claimed upon other grounds.

Assuming that the trustees had the power to sell and transfer this stock, it would seem to be unquestionable that the bank, regarded as a bona fide purchaser, and without notice, will be protected. The opinion of the Circuit Court of the United States for the Maryland District, in the case of *Lowry* vs. *The Commercial and Farmers Bank of Baltimore, and others*, delivered by the Chief Justice, in July, 1848, is very clear and full upon this point; and the same principle was conceded in the case of *Wayman and Stockett* vs. *The Westminster Bank, et. al.*, 5 Gill, 336.

The mischiefs which would be consequent upon a different doctrine, in disturbing the usages of trade and business, and in depreciating the value of property of this description, are stated forcibly by the Chief Justice in the case referred to, and are distinctly presented by the court in the case of *Davis* vs. *The Bank of England*, 9 Eng. Com. Law Reps. 444. In the latter case, though the property in the stock did not pass, the transfer having been made by a forged power of attorney, yet it was decided that a bona fide purchaser from the party who committed the fraud was entitled to recover from the bank the dividend which fell due upon the stock, which consisted of consolidated annuities, made payable at the Bank of England. The Judge said in that case—"If this be not the law, who will purchase stock, or who can be certain that the stock which he holds belongs to him?" That "this facility of transfer is one of the advantages belonging to this species of property, and this advantage would be entirely destroyed if a purchaser should be required to look for the regularity of the transfer to all the various persons through whom such stock had passed."

The case of *Wayman and Stockett* vs. *The Westminster Bank, et al.*, may, perhaps, be understood as going beyond the case

decided in the Circuit Court, for in that case the stock was transferred by parties who had no legal authority to make the transfer, not being clothed with the legal title, and having but a limited beneficial interest in the stock itself, and yet the Messrs. Wilson, who took the transfer from parties thus destitute of the legal capacity to sell, and having but a limited beneficial interest, being bona fide purchasers without notice, were protected. And it is very manifest, that unless purchasers may rely with confidence upon the certificate of the bank, as evidence of ownership, the difficulty of tracing out the true title and the distrust which must surround this description of property, will materially diminish its marketable value. In the case of *Hodges* vs. *the Planters Bank of Prince George's County*, 7 *G. & J.*, 306, the Court of Appeals say—(speaking of a transfer of the stock of a bank made by the proper officers upon the books,)—"If fraud or collusion exist, it will, as in all other cases, vitiate the act; but if there be no fraud or collusion, the bank, and not the transferree, must abide the loss, if a loss be sustained by any act of the proper officer of the bank arising either from a misconception of his duty or a want of judgment."

So far, therefore, as the Savings Bank is concerned, they being bona fide purchasers without notice, it might not be necessary to show that the trustees, Samuel and Andrew D. Jones, had legal authority to transfer this stock. If the city of Baltimore suffered them to make the transfer upon their books, and issued a certificate to the transferree, the city, and not the transferree, must bear the loss; and whether the title to the stock passes or not, the latter will be protected; unless, indeed, the party by whose negligence or default the loss was occasioned should be incapable of making it good, which, of course, in this case cannot be supposed.

But my opinion is, that Samuel and Andrew D. Jones had the legal capacity to transfer this stock, though they may have committed a breach of trust in doing so.

In the entry in the books of the city, there was added to their names, as proprietors of this stock, the word "trustees."

The language of the entry, as appears by the certificate, is,

"that the corporation of the city of Baltimore is indebted to Samuel Jones and Andrew D. Jones, trustees, in the sum of," &c.; but there was nothing there to show who was the *cestui que trust*, or what the nature of the trust was; nor is there any ground for believing that the officers of the corporation did know in fact.

In the case of *Harrison* vs. *Harrison*, which was supposed by the court in *Davis* vs. *The Bank of England*, to be best reported in 2 *Atk.*, 121, the legal authority of the trustee to transfer was conceded; though in doing so he might be guilty of a breach of trust, and of course responsible to the *cestui que trust*.

The judge, in *Davis* vs. *The Bank of England*, in remarking upon this case, as reported in *Atk.*, says—"In this report, it appears that the stock was transferred by a trustee, and if so, the question whether a transfer unauthorized by a stockholder would alter the property in the stock, could not arise, the trustee having a legal authority to transfer, although he might be guilty of a breach of trust in exercising that authority."

The case of *Stockdale* vs. *The South Sea Company*, reported in *Barnardiston*, 363, has been relied on as maintaining a contrary doctrine; but I do not so understand it. In that case, speaking of the company, the Lord Chancellor says—"However, it is very certain, that these great companies are only to consider the person in whose name the stock is standing, unless the trust of the stock is declared on their books." Now, what is meant by a declaration of the trust? Does it mean the mere addition of the word "trustee" to the name of the person who appears upon the books as the stockholder; or must there not be something indicating the character of the trust, or the party beneficially interested?

There never could have been a question, I presume, of the power of a person to transfer stock in whose name it stood, simply, and without any addition; and when the courts speak of the legal authority of a trustee to transfer, they must be understood as meaning trustees, who are known to be such, either by some entry upon the books of the corporation, or in some

other way. To doubt the power of the party in whose name the stock stands, when there is nothing to show that he holds it in a fiduciary character, would seem to be impossible: and, therefore, when questions have arisen as to the legal authority of the trustee to sell and transfer, it must be understood as applying to cases in which the fiduciary character appears, but there is nothing to indicate the nature of the trust or the beneficiaries. It is supposed to be very clear, that no relief can be had against the Savings Bank of Baltimore, except with regard to the surplus in their hands, unless the fact that Samuel Jones was a director of the institution at the time of the loan to him, renders them liable.

The second proviso to the second section of the act of 1818, ch. 93, (the charter,) declares among other things, the corporation shall not be authorized to loan any part of the funds deposited to any director of said corporation.

The loan in this case was to the firm of Talbot Jones & Co., of which, as it appears by the evidence, Samuel Jones, the director, was the only member; and it is insisted that, as the charter prohibits loans to directors, the contract was void, and the bank acquired and could exert no title to the stock pledged as security for the repayment of the money loaned.

If the contract of loan between the bank and Jones were now open and unexecuted, and an attempt were made to enforce its performance, it appears to me the case of *The Pennsylvania, &c. Steam Navigation Co.* vs. *Dandridge*, 8 G. & J., 284, would be conclusive upon the question. The doctrines announced by the court at pages 318, 319 and 320, render it too clear for controversy, that even the corporation itself, may avail itself of the want of authority to make the contract sought to be enforced against it, though it has received and enjoyed the consideration upon which it was made.

If, then, a suit had been brought by the bank against Jones, or by Jones against the bank, upon this contract, it would, in my judgment, have been competent to either of the defendants, under such circumstances, to deny the validity of the contract, as forbidden by the charter.

35*

But this is not a suit upon the contract by either of the parties thereto, against the other. The contract between the parties has been consummated and closed by a sale of the stock held by the bank and the re-payment of the money loaned. There has been a satisfaction and extinguishment of that contract by payment, four months before this bill was filed by a stranger to that contract; and the question is, whether it is competent to this stranger, now that the money has been paid and the contract performed, to open it, and, upon the ground that it was interdicted by the charter, take away the money from the bank?

I cannot think so. Even in the case which has been referred to, of *The Steam Navigation Co.* vs. *Dandridge*, which was a suit between the parties to the contract, I am persuaded, that if either of them, after the performance of the contract, had instituted an action against the other, either to recover back the money paid, or for any other purpose, and had placed its right to recover upon the ground of the invalidity of the contract, the answer would have been—you come too late with your complaint, the contract has been performed and is extinguished, and there is an end of it.

I am, therefore, of opinion, that there can be no decree against the bank, except for the surplus which it holds for the party legally entitled thereto.

The right of the complainants to a decree against the city of Baltimore will now be examined.

The answer of the city denies all knowledge in fact of the decree referred to in the bill, or that the said stock was set apart and directed thereby to be held by Samuel Jones and Andrew D. Jones, as trustees, under the will of Talbot Jones, for the use of Mrs. Albert; or that the transfer of said stock by the trustees, to the bank, was made with the knowledge of the officers of the corporation, for the use and benefit of Samuel Jones, or Andrew D. Jones, or in any manner misapplied from the purposes for which it was held in trust.

And the answer likewise denies that the officers of the city corporation knew for whom the said Samuel Jones and An-

drew D. Jones did hold said stock, and there is no evidence bringing home to the many knowledge, in fact, of any of these particulars.

The question then is—are there in the facts and circumstances of this case sufficient grounds to charge the city of Baltimore with constructive notice of the violation of his duty as trustee, by Samuel Jones ?   Did the city know enough to put it on the inquiry and to make it responsible for neglecting to do so, in the same manner as if it knew; in fact, of the existence, character and nature of the trust; and that the trustees, or one of them, meant to misapply the trust fund when the transfer was made ? · If the city is liable at all, it is upon the ground of negligence, in not instituting the proper investigation, when it was in possession of the knowledge of circumstances sufficient to awaken its suspicions that Jones was about to commit a breach of trust by a misapplication of the trust property.

In this case, as has been stated, the stock' stood upon the books of the city, in the names of Samuel Jones and Andrew D. Jones, trustees ; but for whom they were trustees, and what was the nature and character of the trust, did not appear.   In this respect, it differs altogether from the case of *Wayman and Stockett* vs. *The Bank, et al.,* in 5 *Gill;* for, in the latter case, the entry on the transfer book of the bank, displayed the origin, nature and character of the trust, and who were the beneficiaries, and the Court of Appeals say, that "the bank by this transfer had notice of the trusts with which the stock was clothed, and that the complainants were the legal proprietors of the stock; and its officers being the trustees of the stockholders, could not, without making the bank responsible, by any negligence or mistake, allow the title to pass to the stock by a transfer, by any other persons than the trustees, without involving the bank in responsibility."   The power of the trustees, holding the legal title, to transfer the stock, thus standing in their names, was affirmed by the court, who maintained them to be the only persons authorized to make the transfer, and the bank was held liable, because it permitted the transfer

to be made by others.    It is believed, however, that even if the trustees had themselves offered to transfer, under circumstances calculated to excite suspicion, that they were about to abuse their trust, the bank would have been bound to institute the necessary inquiry, and if it omitted to do so, and loss resulted, the loss would be thrown upon it.

Such was the decision of the Circuit Court, and such is believed to be the law.    There are, however, circumstances in the case referred to in the Circuit Court, which clearly distinguish it from this.

In that case, long after the period allowed by the law in this state for the settlement of the estates of deceased persons, one of the executors, his co-executor not concurring, transferred the stock to another bank as security for the loan obtained by him.    This loan being repaid, the bank, from whom the executor borrowed the money, transferred the stock back to him, by the name of the commercial firm under which he was trading, by which name he subsequently transferred the same stock to himself and his co-executor, as such ; and then, shortly afterwards, the same party signing his name as acting executor, again transferred the stock to the same bank as security for other sums borrowed by him for his own use, and these latter loans not being paid by him, the stock was sold, and hence the loss.    These various acts, the Chief Justice said, all appearing upon the books of the bank permitting the transfer, the purpose for which the last transfer was made, could not be doubted by the officers, familiar as they were with the usage of loaning money upon the hypothecation of stock; and in truth, as stated by the court, the bank, in its answer, impliedly admits such knowledge by saying, "if the president had known that the transfer was about to be made, he would have prevented it."

In this case, there was but a single transfer, and that was made by both the parties in whose names the stock stood, and there is nothing in the answer of the city, or to be found in the evidence, upon which any presumptions can be raised, that the officers of the city knew, or suspected, that the parties making the transfer were abusing their trust.

In this case in the Circuit Court the stock stood in the name of the deceased, Talbot Jones, and was transferred by Samuel Jones as executor, from which the bank must have known that there was a will; of which, as the Chief Justice says, in Maryland, the bank was bonnd to take notice. In this case, though the stock may at one time have stood in the name of the deceased, yet, from the year 1841, it had stood in the name of the trustees, and as these trusts may be, and often are, created by agreement, of which no record need be made, the same facility of ascertaining the true ownership of the property did not exist, as in the case decided in the Circuit Court, where the bank was pointed to the will of the deceased, to be found upon the public records of the state.

In the case now under consideration, the officers of the city of Baltimore saw by the books of the corporation that this stock had stood in the names of these parties as trustees, from 1841 to 1845; and although in 1841 it had been transferred by themselves as executors to themselves as trustees, and although the transfer made by them as executors in 1841, was evidence that Talbot Jones left a will, yet as the stock continued to stand in their names as trustees from that time down to 1845, the officers of the city might well assume that the will of the deceased had ceased to operate upon it.

There is another circumstance in this case, which, as it appears to me, draws a marked line of distinction between it and the case decided by the Circuit Court.

The dividends upon this stock, from January, 1842, to October, 1845, inclusive, were paid to the husband of Mrs. Albert, under an authority to her, signed by the executors, and from October, 1845, to January, 1847, during which period it stood in the name of the Savings Bank, they were paid to its president, Mr. Cushing, and there is no evidence whatever, that during that time, or until the filing of this bill, in May, 1847, any inquiry or complaint was made by the complainants to the city, on account of this diversion of their accustomed receipts.

The bill alleges that in May, 1846, one of the complainants informed Mr. Cushing that this stock was held by the trustees,

in trust for the female complainant; but this allegation is expressly denied in the answer of Mr. Cushing, and there is no evidence in support of the averment. The answer admits that there was a conversation between William J. Albert and the respondent, in the spring of 1846, in reference to a parcel of the stock of the Water Company, held by the bank as security for money loaned to the firm of Talbot Jones & Co., in which he, Albert, intimated that the stock was his, or that he had some interest in it, but the answer wholly denies that the conversation related to the stock now in controversy.

When this conversation was held, two dividends had accrued on this stock, those for January and April, 1846. They had accrued and been received by the Savings Bank, since its transfer to them in October, 1845, and it is difficult to believe that Mr. Albert, who had been accustomed to receive the dividends himself, did not know at that time, of the transfer of the stock to the bank : and yet he said nothing about it, though setting up a claim to another parcel of stock which had been placed with the bank by the same parties.

Samuel Jones, in his answer, says, that he transferred this stock to the Savings Bank in 1845, with the full knowledge and consent of said Albert, and the presumption is, I think, very strong that this is the case; as, otherwise, it can scarcely be doubted, inquiries would have been instituted by him, and the stock traced to the bank; and if Albert, the husband, knew it, and consented to it, it is certainly not pressing presumption to an unwarrantable extent to presume that Mrs. Albert also knew and consented to it.

It is not at all reasonable to suppose, that the loss of the income and dividends upon this stock would not have excited inquiry; and inquiry of the officers of the city would have led directly to a knowledge of the party to whom the stock had been transferred. It may be, that if the complainants had (in the latter part of 1845 or in the spring of 1846, when, I think, they must have known of the transfer of this stock) adopted the proper steps, or given the necessary information to the city and bank, that no loss would have occurred.

Samuel Jones did not stop payment until September, 1846, or petition for the benefit of the insolvent laws until January, 1847 ; and it may very well be said, if the officers of the bank and the city had been put on their guard in due season, they might have secured themselves from loss, if, under the circumstances of the case, they would have been liable.

This was not done, and it was not until after the failure of Jones that this bill was filed, which, for the first time, brought to the knowledge of the defendants the facts upon which relief against them is asked.

I do not think that the entry upon the books of the corporation, that this stock stood in the names of Samuel Jones and Andrew D. Jones, trustees, was standing by itself, sufficient to put the city upon the inquiry, and to make it responsible upon the ground of negligence ; and I am not prepared to say that the fact that another received the dividends upon the order of the trustees, would have that effect.   But, be that as it may, there has, I think, been negligence, if not acquiescence, on the part of the *cestui que trusts* quite equal to that imputed to the city, and, therefore, I do not think they are entitled to relief.

The bill will be dismissed as against the city and Cushing, and as against the bank there will be a decree for the surplus now held by it.

[This decree was appealed from, but no decision has yet been had upon the appeal.]